Hiram W. Evans v. Commissioner. Hiram Wesley Evans v. Commissioner.
Hiram W. Evans v. Commissioner
Docket Nos. 3313, 3314.
United States Tax Court
1946 Tax Ct. Memo LEXIS 200; 5 T.C.M. (CCH) 336; T.C.M. (RIA) 46102; April 30, 1946
*200 Petitioner organized, financed, managed and controlled successively three different partnerships of which his wife, three children, a brother-in-law and his secretary were named as partners. The partnerships also operated in part under certain trade names. The business of the partnerships was largely that of sales agent for road building materials on a commission basis. Held, under the facts, petitioner is taxable on all of the income of the partnerships. A. W. Clapp, Esq., Morgan Belser, Esq., and J. T. Rose, Esq., 702 Citizens & Southern National Bank Bldg., Atlanta, Ga., for the petitioner. F. L. Van Haaften, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These consolidated proceedings involve income taxes for the years 1937 to 1941, inclusive, in the following *201 amounts: Year
Deficiency
1937
$ 49,109.56
1938
2,873.70
1939
8,153.06
1940
236,547.73
1941
51,385.33
Some of petitioner's assignments of error in respect of the adjustments to his income tax returns were abandoned either at the hearing or on brief. The remaining issues are: 1. What profit did petitioner realize on his stock in Southeastern Construction Company, when that corporation was dissolved in 1937? 2. Is petitioner taxable on all of the income for the years 1937 and 1938 from the business operated under the name of Southeastern Construction Company? 3. Is petitioner taxable on all of the 1939 income from the businesses operated under the names of Eastern Construction Company No. 1 and Southern Improvement Association? 4. Is petitioner taxable on all of the 1940 income from the businesses operated under the names of Eastern Construction Company No. 2 and Southern Improvement Association? 5. Is petitioner taxable on the 1941 income from the businesses operated under the names of Eastern Construction Company No. 2, Cooperative Asphalt Association, Highway Construction Company and Southern Improvement Association? 6. Did respondent err in *202 disallowing deductions claimed by the following concerns for business expenses for the years and in the amounts set out below: Eastern
Eastern
Construc-
Construc-
Southeastern
tion
tion
Construction
Company
Company
Year
Co.
No. 1
No. 2
1937
$16,737.99
1938
13,682.23
1939
2,055.11
$1,109.66
1939
69.00
1940
$4,649.62
1941
2,649.2
7. Did respondent correctly disallow deductions claimed by Southeastern Construction Company for the year 1939 for attorneys' fees in the sum of $500 and charitable contribution in the sum of $12.50? 8. Did respondent err in disallowing as deductions from gross income for the taxable years 1940 and 1941 the sums of $3,918.90 and $465.83, respectively, claimed as business expense in connection with Cochran Mill? 9. Did respondent err in computing the income for 1941 of the businesses operated under the names of Modern Asphalt Company and Highway Construction Company, and the income of Southern Improvement Association for the years 1939 to 1942, inclusive, on an accrual basis? 10. Did respondent err in increasing the income of Southeastern Construction Company for 1937 by additional *203 commissions from Emulsified Asphalt Refining Company in the sum of $916.24? 11. What is the reasonable value of the services rendered by Mrs. Vines, Dr. Hill and Martha Evans Wood to the various business enterprises during the taxable years involved? 12. What is the correct amount of dividends received by petitioner from his American Power & Light Company stock for the taxable years 1939 and 1940? 13. Is petitioner entitled to deduct $1,575.52 interest paid in 1937 on notes signed by him and his wife? 14. Is petitioner entitled to an additional deduction for interest paid in 1938, not claimed in his return, alleged to represent one-half of interest paid on notes signed by him and his wife where the wife filed separate return? 15. Is petitioner entitled to deduct interest claimed to have been paid to the American Savings Life Insurance Company during the taxable years 1937 to 1940, inclusive, in the respective amounts of $361.50, $218.27, $361.50 and $723? 16. The final issue is whether or not petitioner is entitled to a carry-back net loss from 1942. By agreement the disposition of this question has been deferred until after the disposition of the foregoing issues and *204 will be resolved under Rule 50. Findings of Fact During the taxable years involved petitioner, an individual, resided with his wife in Atlanta, Georgia. His individual income tax returns for these years were filed with the collector of internal revenue for the district of Georgia. Petitioner and his wife, Ellen B. Evans, were the parents of three children, Cecil Evans, born April 1, 1905, Martha Evans Wood, born July 10, 1907, and Ellen E. Gottenstrater, born June 12, 1919. Some time prior to 1937 petitioner became interested in the emulsified asphalt business. Emulsified asphalt is a liquid manufactured and produced from raw asphalt and is used in paving roads and highways. One of the advantages of this product over ordinary asphalt is that it can be applied in cold weather. For a few years preceding 1937 petitioner was engaged in the business of manufacturing this product under the name of Emulsified Asphalt Company of Georgia. This organization acquired a few contracts and obtained some business both from the State of Georgia and Civilian Conservation Corps. By 1937, however, petitioner became convinced that he could not compete successfully with the larger companies engaged *205 in this end of the asphalt business. On or about April 13, 1937, petitioner caused a corporation to be organized known as Southeastern Construction Company for the purpose of engaging in the sales end of the emulsified asphalt business. This corporation had outstanding stock of $1,000, all of which was owned by petitioner. Soon after it was organized petitioner, who had been executive head of the Ku Klux Klan, became fearful that his Klan activities might lead to groundless lawsuits which would subject him and his family to needless expense. In order to protect his family petitioner conceived the idea of forming a holding company and creating a separate corporation for each member of his family. After consultation with his attorney he concluded that a partnership in which each member of his family would have an equal interest would serve the same purpose. On August 21, 1937, petitioner caused Southeastern Construction Company, a corporation, to be dissolved. Petitioner's stock therein was surrendered and he realized a profit on the liquidation of $839.69. During the existence of this corporation it represented American Bitumuls Company, Emulsified Asphalt Refining Company, and Shell *206 Union Oil Company, as their agent in the sale of emulsified asphalt manufactured and produced by these companies. Practically all of its business was done with the State of Georgia. Petitioner's duties in connection with this corporation consisted of making all contacts for the sale and distribution of emulsified asphalt, developing new sources of business, doing all the bidding on contracts, interviewing various representatives and civic organizations in an effort to induce them to use the product, and otherwise running the business. This corporation operated as a sales agency only and did not own any plant or equipment except perhaps some office furniture. It carried no inventories and its business affairs were conducted from petitioner's office in Atlanta. Due to the influence of petitioner with various state and county officials and his ability in obtaining contracts, the business grew rapidly. On or about July 16, 1937, petitioner, his wife and their three children entered into a partnership agreement to operate a business to be known as Southeastern Construction Company, hereinafter referred to as Southeastern. Petitioner was designated as general manager and had entire control *207 over the business affairs of the new concern. The profits and losses were to be divided equally among the partners. None of the parties to this agreement made any investment in the business at this time. No separate investment accounts were set up on the partnership books and all income and withdrawals were carried in one account labeled "Evans Partnership Account". On the same day each of the parties to this agreement executed a general power of attorney authorizing petitioner to act as his agent. Petitioner testified that he felt these were necessary in order to facilitate business operations in the absence of any of the partners. This partnership agreement was recorded with the appropriate state and county authorities. Petitioner's duties and activities in connection with the new concern were the same as with the corporation of the same name. During the year 1937 approximately $91,000 was withdrawn from this business by petitioner. While some of this money was later returned, a greater part of it was used for petitioner's personal and family expenses. During the business existence of Southeastern the various members of petitioner's family withdrew nominal amounts with the consent *208 of petitioner or his wife. The earnings were credited to their respective accounts. Petitioner's secretary, Mrs. Vines, had complete charge of the books and records of the business, which were kept on a cash receipts and disbursements basis. The funds of Southeastern were deposited with the Fulton National Bank in Atlanta. Petitioner, his attorney and Mrs. Vines were the only persons authorized to sign checks on this account. Petitioner could make withdrawals without a co-signer, but his attorney and Mrs. Vines were required to sign checks jointly. During this period petitioner operated two brokerage accounts, one for himself and one for Mrs. Vines. Petitioner arranged with Mrs. Vines so that he had authority to operate these accounts, the principal remaining his property. However, Mrs. Vines was to participate in any profits. Substantial portions of the above mentioned $91,000 drawn from the partnership account by petitioner were used in the brokerage accounts. Southeastern's income was primarily derived from commissions earned on sales of emulsified asphalt. In addition to its income from this source, during the period September 1, 1937 to March 1, 1938. Southeastern conducted *209 a business under the trade name of Georgia Bitulithic Company. The income from this source was reported on the partnership information return filed by Southeastern. This business was organized to carry out a special arrangement with Wood Road Mixer Company. Under this arrangement, the latter would carry out the contract with the State of Georgia secured by Southeastern and present its bills to the Georgia Bitulithic Company. These bills were paid and in turn Georgia Bitulithic Company would present its bills to the State of Georgia and receive its money from the State. Southeastern filed a partnership return of income for the year 1937 reporting a net income of $100,714.68 and indicating that this sum had been distributed among the five members of the Evans' family as partners. This return also indicated that the partnership owned real estate, none of which was used in connection with its business. A similar partnership return was filed for 1938 showing a net income of $5,210.48 and showing a similar distribution to the members of the Evans' family as partners. Both of these returns were prepared and filed on the cash receipts and disbursements basis. On or about August 14, 1939, Southeastern *210 was dissolved. All of the assets owned by Southeastern were transferred to Eastern Construction Company, a new partnership organized August 14, 1939, hereinafter referred to as Eastern No. 1. In this new partnership arrangement Mrs. Vines and Dr. J. B. Hill of Dallas, Texas, a brother of Mrs. Evans, were made partners along with petitioner, his wife and three children. By the terms of this partnership agreement petitioner was designated as general manager and Mrs. Vines as secretary and treasurer. Each of the parties to the new arrangement signed a demand note in the sum of $2,000 as his contribution to the new firm's capital. The only other funds brought into the organization were the credit balances of the "evans Partnership Account" and petitioner's personal account. Southeastern filed a partnership return of income for the period January 1, 1939 to August 31, 1939, showing a net loss of $3,822.57 for that period. Eastern No. 1 continued to carry on the same work and same business operations formerly conducted by Southeastern. Its income was derived chiefly from commissions on the sale of emulsified asphalt. Eastern No. 1 owned no equipment for road building or mixing asphalt *211 and carried no inventories. Toward the end of 1939 petitioner learned that his business activities were being investigated by the Attorney General of the United States in connection with claimed violations of the anti-trust laws. He thereupon determined that he should withdraw from the partnership and become an employee thereof in order to protect his family. On December 20, 1939, Eastern No. 1 was dissolved. On January 1, 1940, Dr. Hill, Mrs. Vines, Mrs. Evans and petitioner's three children entered into a partnership agreement to continue the business as Eastern Construction Company, hereinafter referred to as Eastern No. 2. This agreement was duly recorded with the appropriate state and county authorities. By the terms of this agreement Mrs. Vines was designated general manager and given authority to employ someone to carry on the managerial duties of the business. Immediately petitioner was engaged as manager of the business at a salary of $1,000 a month plus expenses, and a new automobile. This salary as well as his expenses were paid from this business. The new enterprise continued to use the same set of books formerly used by Eastern No. 1. Petitioner's investment account *212 with Eastern No. 1, amounting to $2,479.75, was credited in equal shares to the other partners. Petitioner's note for $2,000, issued when Eastern No. 1 was organized, was cancelled. On December 31, 1940, the notes of the alleged partners issued in connection with the organization of Eastern No. 1 were written off the books as paid out of profits. The income of Eastern No. 2 for 1940 came from various sources but was carried on the firm's books as commissions. During that year it received income from contracts made with E. Jack Smith, a contractor. In addition, Eastern No. 2 operated a business under the trade name of Modern Asphalt Company covering its business activities in the State of Georgia on behalf of Wesco Paving Company of Chattanooga. On or about October, 1940 petitioner caused to be set up a trade name within the organization of Eastern No. 2 known as Cooperative Asphalt Association to do business with the Georgia Highway Improvement Association of Washington, D.C. Cooperative received commissions from Georgia Highway Improvement Association for services rendered in connection with emulsified asphalt sold and delivered to the State of Georgia. After this commission arrangement *213 ended Georgia Highway Improvement Association leased its plant to Cooperative Asphalt Association, which then engaged in the production and sale of emulsified asphalt. There was no partnership agreement during the taxable year for this organization. It was merely a trade name for certain operations of Eastern No. 2. The income from this source was reported in the partnership return of income filed by Eastern No. 2 for the year 1940 and showed commissions earned totaling $41,416.11. This return indicated that it was prepared and filed on the cash receipts and disbursements basis. The books and records of Eastern No. 2, covering its income from all sources, were kept on the cash basis of accounting and clearly reflected its income for the year 1940. In May 1940 petitioner, together with the three companies for which he acted as agent, namely, American Bitumuls Company, Emulsified Asphalt Refining Company, and Shell Union Oil Company, was indicted for claimed violation of the anti-trust laws. Petitioner entered a plea of nolo contendere and was fined $15,000, which fine was paid January 24, 1941. Petitioner issued his check in payment of the fine and on January 24, 1941, $15,000 was *214 transferred from the bank account of Cooperative Asphalt Association to the personal account of petitioner to cover this check. This sum was charged equally to the accounts of the various partners and was not repaid or reported as income by petitioner. On August 12, 1941, Mrs. Vines, Dr. Hill, Mrs. Evans and petitioner's three children entered into an agreement to do business under the trade name of Highway Construction Company, hereinafter called Highway. Petitioner was named general manager and Mrs. Vines was named secretary and treasurer. Each of the parties to this agreement executed a $2500 note to represent his investment therein. The notes were never paid. Petitioner put $15,000 into the business. This agreement was not registered with the appropriate state and local authorities until 1942, and the income from this source was carried on the books of Eastern No. 2 and reported in the partnership return of income filed by that organization for the year 1941. That return reported income from Cooperative Asphalt Association in the sum of $44,846.40, income from Highway in the sum of $22,869.91, and from its own operations a net operating loss of $13,240.75, and a net loss of $12,136.16. *215 This return indicated that it was prepared and filed on a cash receipts and disbursements basis. Highway was organized to do business with the W. L. Cobb Construction Company for the purpose of furnishing paving materials to the State of Georgia. Under the arrangement existing between W. L. Cobb Construction Company and the State of Georgia, the state withheld 10 percent of each billing; this 10 percent was retained as a guarantee of satisfactory performance and was to be released when the entire job was finished. W. L. Cobb Construction Company in turn withheld 10 percent of each billing made by Highway. For the year 1941 W. L. Cobb Construction Company withheld $11,890.13 from Highway billings, which sum was not paid until 1942. On or about August 8, 1939, Dr. Hill, Mrs. Vines, Mrs. Evans and petitioner's three children entered into an agreement to do business under the name of Southern Improvement Association, hereinafter called Southern, to promote asphalt sales in the State of Alabama. Under this arrangement Mrs. Vines was named general manager and each of the parties was to contribute $2,000 capital. This contribution was made by each of the parties giving a demand note for *216 $2,000. At the end of 1940 these notes were cancelled as having been paid out of earnings. Southern was formed to handle the promotion and sale of asphalt in the State of Alabama and to handle the Warren Brothers Road Company account. Southern's principal business was with Warren Brothers Road Company, Interstate Amiesite Company, Asphalt Products Company, and E. Jack Smith, contractor. Under its arrangement with Warren Brothers Road Company, Southern was to assist it in the operation and supervision of an asphalt plant, in consideration of which Southern was to receive 40 cents a ton commission on asphalt manufactured. In addition Southern was to receive 50 percent of the net profits from the sale of asphalt distributed from such plant. Receipts from this contract were carried on Southern's books as commissions. On October 8, 1939, Southern entered into an agreement with Interstate Amiesite Company whereby Southern was named selling agent for paving materials manufactured by that company. This contract was almost identical with the contract with Warren Brothers Road Company. Both of these contracts were negotiated by petitioner. Southern was under the control and management of petitioner. *217 With the exception of the months of June, July and part of August, 1939, Mrs. Vines worked in petitioner's office in connection with all of these enterprises. She handled the books and records, signed checks, made all disbursements and took care of the bank accounts. She ran the office in petitioner's absence. Until June 1939 she was paid $80 a month for her services in this connection. Until that time she had received an additional salary from the Ku Klux Klan so that her total earnings were approximately $200 a month. When she returned to petitioner's office in August 1939 as a partner, she received her share of the profits and devoted her full time and attention to the operations of these various enterprises. A reasonable value for the services rendered by her in connection with all of these businesses was $200 a month. Neither Mrs. Vines, Hill nor any member of petitioner's family invested anything in any of the enterprises herein involved other than from credits to them out of earnings. Petitioner alone made the initial investments. He controlled at all times the business in its various aspects and withdrew at will the funds thereof for such use as he wished. Petitioner had *218 complete control of the accounts of the various enterprises and at his direction funds were shifted from one account to another according to his wishes. It was petitioner's contacts and influence which enabled these various enterprises to get the business. None of the members of petitioner's family knew anything about the asphalt business or devoted any appreciable time or attention to the business operations of these enterprises during the taxable years involved. Dr. Hill took no active part in the business operations of any of the organizations in which he was an alleged partner. The use of capital was only incidental in the conduct of these businesses. All of the income from all of the enterprises operated and managed by petitioner was the result of his personal efforts. The books and records and income tax returns covering the income of the businesses operated under the name of Modern Asphalt Company, Highway Construction Company and Southern Improvement Association were kept and filed on the cash receipts and disbursements basis. The books of account kept in connection with the activities of Modern, Highway and Southern clearly reflect the income of these businesses for the *219 taxable years involved. All of the business enterprises conducted by petitioner regularly employed the cash method of accounting and reporting income. During the taxable years 1939 and 1940 petitioner was the owner of 100 shares of American Power & Light Company stock. In 1939 he received dividends from this source totaling $431.25 and in 1940 he received dividends from this source totaling $593.75. In 1937 petitioner paid $1,575.52 interest on a note signed by him and his wife. The note was his obligation. On November 6, 1938 petitioner was indebted to the American Savings Life Insurance Company for insurance premium in the amount of $815.76, and interest on a loan in the amount of $361.50. On that date he executed to the Insurance Company his note in the principal sum of $1,177.26, the total amount of such indebtedness. The amount of $277.26 was paid on the note at the time of its execution. No part of this payment represented interest. The remainder of the note was paid by installments in the year 1939. The amount of $361.50 of such payments represented interest. In addition thereto petitioner paid interest in 1939 in the amount of $23.03 on the 1939 installment payments. *220 On November 6, 1939 petitioner was indebted to the Insurance Company for premium and interest in the total sum of $1,177.26. He executed his note for the amount thereof. On December 29, 1939 he paid on the note $177.26. No part of this payment represented interest. In the year 1940 he paid on the note $823.00, of which amount $184.50 represented interest. Petitioner owned a country home near Atlanta called Cochran Mill. In its tax returns for 1940 and 1941 Eastern No. 2 claimed deductions from income in the amounts of $3,918.90 and $465.83, respectively, as business expenses incurred in connection with entertainment at petitioner's country home. Of the amount claimed in 1940, $3,200 was spent in replacing a dam on the property, which had been washed out. Cochran Mill was used in part for business reasons by petitioner on occasions when he entertained. Petitioner is entitled to a deduction of $150 as reasonable expense incurred in connection with business entertainment at Cochran Mill for the year 1940 and $100 as reasonable expense incurred in connection with business entertainment at Cochran Mill for the year 1941. In 1937, 1938 and 1939, Southeastern Construction Company claimed *221 deductions for promotional and sales expenses, in the respective amounts of $21,516.44, $15,320.24 and $2,055.11. Respondent disallowed part of these deductions in the respective amounts of $18,647.59, $13,682.23 and all of the item $2,055.11. In 1939 Eastern No. 1 claimed deductions for similar expenses which were disallowed in toto in amounts totaling $1,178.66. In 1940 and 1941 Eastern No. 2 claimed deductions for similar expenses which were disallowed in toto in the respective amounts of $4,520.42 and $2,649.62. The disputed deductions were claimed by petitioner to have been spent for luncheons, dinners, entertainment and incidentals in Atlanta and throughout the State of Georgia in an effort to induce various state and county officials to use emulsified asphalt for the Georgia highway construction program. As a matter of practice petitioner would either ask Mrs. Vines for a check in advance of the expenditures or would advise her that he had spent varying amounts for "promotion expense" and she would then issue a check to reimburse him. Twenty-five percent of the amounts claimed as deductions by each of the foregoing organizations for each year was reasonable, ordinary and necessary *222 expense incurred by petitioner in connection with his business and is deductible from gross income. In 1937 Southeastern Construction Company received commission from Emulsified Asphalt Refining Company over and above that reported in its return in an amount of $916.24. In 1939 the business conducted as Southeastern Construction Company gave $12.50 to the Atlanta community fund. All of the earnings of the various business operated and managed by petitioner during the taxable years involved were the result of his personal efforts. During the taxable years 1937, 1938 and 1939, petitioner conducted his business through the Southeastern Construction Company, the corporation, and through various other mediums. The execution of the partnership agreements during these years had no effect on his status as the earner and producer of the income from these sources or on his dominion and control over the business. His withdrawal from these various partnership agreements, covering all of these enterprises, on January 1, 1940, likewise had no effect on his dominion and control over the business or on his position as the earner and producer of the income. Opinion The first issue is whether *223 or not respondent correctly computed petitioner's gain on his stock in Southeastern Construction Company, the corporation, when that organization was liquidated in 1937. It is undisputed that petitioner received $985.19 over and above the cost of his stock. Petitioner insists that this amount should be reduced by the amount of corporate labilities assumed by him on the liquidation. Some of the liabilities so assumed have already been paid and claimed as a deduction in connection with one or another of petitioner's business enterprises. Taxes due the Federal government in the amount of $114.35, and the State of Georgia in the amount of $51.00, are the only unpaid items. Respondent contends that in the absence of proof that these taxes were paid during the taxable year petitioner is not entitled to the increased basis for his stock. As we see it petitioner is only interested in increasing the basis of his stock and is not claiming them as deductions from gross income. On this point petitioner is sustained. Park & Tilford, 43 B.T.A. 348, at pp. 380 and 381. A second issue is whether petitioner is taxable on the income from the business conducted under the name of Southeastern *224 Construction Company after July 16, 1937. On brief petitioner conceded that his actions in relation to the operations of this business were inconsistent with his contention that he had made bona fide gifts of various parts of the business to the members of his family. In view of petitioner's dominion and control over the operations of the business and the income therefrom, respondent's contention on this issue is sustained. Helvering v. Clifford, 309 U.S. 331. The third issue is whether petitioner is taxable on the income of the businesses operated under the names of Eastern Construction Company, No. 1 and No. 2, Southern Improvement Association, Cooperative Asphalt Association, and Highway Construction Company, for the taxable years 1939, 1940 and 1941. Petitioner contends that bona fide partnerships for income tax purposes existed in each of these enterprises and that the partners are properly taxable on their distributive shares. He pointed out that effective January 1, 1940, he withdrew as a partner in these enterprises and thereafter served only as an employee at a stipulated salary. He further urges that to carry on the businesses operated under these various *225 trade names required capital and that each of the partners contributed thereto. Petitioner appears to rely on Robert P. Scherer, 3 T.C. 776; M. W. Smith, Jr., 3 T.C. 894; Tower v. Commissioner, 148 Fed. (2d) 388, cert. granted; J. D. Johnston, Jr., 3 T.C. 799, and similar authorities. Respondent contends that the earnings of the businesses were due entirely to petitioner's personal services and efforts. He contends that these various arragements engineered by petitioner should not be recognized because they effected no real change in petitioner's economic status and were only devices to reduce the income taxes of the Evans family. From an examination of the entire record we are convinced that respondent must be sustained in his determination. We are satisfied that the earnings from these various enterprises were due entirely to petitioner's efforts, management and control. Most of the income was derived from commissions. It is undisputed that petitioner was the salesman who negotiated all of the contracts that produced the income of the various enterprises. The insignificant investments (payable out of earnings) made by the various *226 members of the Evans' family, Dr. Hill and Mrs. Vines are of little significance when one considers the nature of the businesses operated. Petitioner admitted that the only reason these alleged investments were made was to attempt to appease the internal revenue officials who were questioning the bona fides of the partnerships. It can not be disputed that petitioner exclusively controlled and managed all of the business enterprises. He ran these organizations as he pleased, earned the income and shifted the funds from one organization to another as his fancy dictated and also expended it as he chose. Nor was the action of petitioner in withdrawing from these various alleged partnership arrangements on January 1, 1940, and ostensibly thereafter serving only as an employee, any help to his contention here. He still remained the producer of the income and continued to run the businesses as he pleased. There was no change in his economic status or in his control over the businesses that would justify our holding that during the taxable years involved petitioner, his family and others were carrying on businesses in partnership or that subsequent to January 1940 he was merely an employee *227 of those same persons other than himself. Lucas v. Earl, 281 U.S. 111; Earp v. Jones, 131 Fed. (2d) 292. See also P. A. Keenan, Sr., 5 T.C. 1371. Mrs. Vines testified that while the various partners felt they had a right to discharge petitioner at any time it would not have been smart to do so. All of the various partners realized the indispensability of petitioner to the continued successful operation of the businesses. We think petitioner's dominion and control over the funds and conduct of the businesses subsequent to January 1, 1940, is inconsistent with his contention that he was only an employee. It is axiomatic in Federal taxation that income is taxable to the earner thereof. We hold that petitioner is taxable on all of the income derived from these business enterprises as the earner and producer thereof. On this issue respondent is sustained. The greater part of the deductions claimed as business expenses and which were disallowed by respondent are described in petitioner's brief as promotional expenses. The amounts involved are substantial. The record is very unsatisfactory as to how this money was spent, for what purpose and how *228 much represented bona fide ordinary and necessary business expenses and how much represented the personal expenses of petitioner. It appears that petitioner was the principal spender of the amounts involved. The practice was for Mrs. Vines to draw a check, cash it and turn the proceeds over to petitioner for this purpose. On occasions petitioner would demand reimbursement of amounts claimed to have been spent for entertainment. Considering the nature of the business petitioner was in, we would have little difficulty in holding that entertainment expenses, by way of luncheons, dinners and similar items, spent in the promotion of sales would be deductible expenses from petitioner's gross income under section 23 (a) (1) (A) of the Internal Revenue Code. The chief difficulty before us is the question of allocation in view of the complete failure on the part of petitioner to itemize these expenses. In Lucien I. Yeomans, 5 T.C. 870, we were confronted with a similar problem. In that case we applied the rule of Cohan v. Commissioner, 39 Fed. (2d) 540, and made an approximation of the amount of the deductible business expenses. In that case *229 we felt there was sufficient evidence to support a finding that 50 percent of the amounts claimed were deductible as ordinary and necessary expenses of the taxpayer. In the present case we hesitate to do that because of the meager evidence offered on which an allocation could be based. Nevertheless, in the light of the Cohan case, we conclude and hold that 25 percent of the expenses claimed by petitioner for promotion and sales expenses during each of the taxable years 1937 to 1941, inclusive, represent ordinary and necessary business expenses. The next issue is whether respondent correctly disallowed certain other claimed deductions. On the partnership return for 1939 Southeastern claimed to have given $12.50 to the community fund of Atlanta. The cancelled check was exhibited at the hearing and identified by Mrs. Vines. On brief respondent admits that there is testimony to support petitioner's contention. We hold that the $12.50 contributed to the Atlanta community fund is deductible from petitioner's income for 1939 as a charitable contribution. The next issue is the correctness of respondent's disallowance of deductions claimed for the taxable years 1940 and 1941, which sums *230 petitioner alleges were spent for business entertainment in connection with his country home, Cochran Mill. Approximately $3,200 of the amount claimed as a deduction for 1940 was spent in replacing a dam that had been damaged by a flood. If we were advised of the date of the loss this amount would be deductible as a loss as a result of a casualty. See Ray Durden, 3 T.C. 1. Again we are faced with difficulty from an evidentiary standpoint. While we are satisfied that petitioner suffered a loss in this respect, from the record we have no alternative but to sustain respondent's disallowance. As to the remaining sums for the year 1940 and the entire amount disallowed for 1941 they appear to be the same type of expenditures discussed above. It is again impossible to tell from the record how much of these sums represented ordinary and necessary business expense. Applying the rule of the Cohan case, we have again made an approximation of the amounts spent for these years. We have found that $150 represents reasonable expenses incurred at Cochran Mill in connection with petitioner's business for the year 1940 and $100 represents reasonable business expenses incurred at Cochran *231 Mill in connection with petitioner's business for the year 1941. The next issue is whether respondent erred in computing the income of Modern Asphalt Company for the year 1941, which income was reported on the return filed by Eastern No. 2, on an accrual basis. A similar question is presented in connection with the income of Highway Construction Company for the year 1941 and the income of Southern Improvement Association for the taxable years 1939 to 1942, inclusive. In each instance respondent insists that the income from these businesses for the taxable years in question must be computed on an accrual basis in order to properly reflect income. Petitioner contends contra. Section 41 of the Internal Revenue Code gives a taxpayer the option of selecting the method of accounting he wishes to use, provided it correctly reflects income. All of the partnership tax returns for the businesses owned and operated by petitioner and petitioner's individual tax returns for the taxable years involved indicated they were prepared and filed on the cash receipts and disbursements basis. Mrs. Vines, who had complete charge of all the books and records of all of petitioner's *232 enterprises, testified that the records were similarly kept. We think that the statute contemplates considerable discretion on the part of the taxpayer in this respect and that respondent's action in this connection was erroneous. We do not think that respondent can seriously contend that petitioner did not regularly employ the cash method of accounting and reporting his income. The suggested change by respondent is permissible only if that system does not clearly reflect petitioner's income. See Ohio Loan & Discount Co., 3 T.C. 849. One hundred percent accuracy in accounting transactions would be difficult, if not impossible, to achieve. The mere fact that one item on a balance sheet of one of petitioner's enterprises was listed as "accrued expenses" is insufficient in our opinion, to disturb petitioner's choice of his method of accounting. We hold that petitioner's books of account kept in connection with the business activities of Modern Asphalt Company, Highway Construction Company and Southern Improvement Association clearly reflect his income from these sources during the taxable years. On this issue we find for petitioner. The next issue arises as follows. In *233 computing the income of Southeastern Construction Company for 1937 the respondent increased its commissions from Emulsified Asphalt Refining Company by $916.24. Petitioner has conceded an additional $760 and only the balance is in controversy. The evidence is meager. Mrs. Vines testified that she had no record of receiving this additional amount. However, she had no record of receiving the $760, which is conceded by petitioner to have been so received. There is a conflict on this point and in view of the state of the record we resolve this question in favor of respondent. The next issue is an alternative one raised by amended pleadings and must be discussed in view of our holding on the principal question involved. Petitioner contends that if we find him taxable on all of the income from these various business enterprises that he should be allowed to deduct a reasonable compensation for the services rendered by Mrs. Vines, Dr. Hill and Martha Evans Wood. We have found that the petitioner is taxable in full the income from the businesses in which these three individuals were claimed to be partners. We have omitted making any finding as to the value of the services rendered by Martha *234 Evans Wood and Dr. Hill because of the negligible services performed by them. In addition there is no evidence as to the value of their services to petitioner, the nature of such services or what the services were reasonably worth, if anything. As to Mrs. Vines, we are satisfied that she performed valuable services for all of petitioner's enterprises and in spite of the lack of evidence as to what her services were worth in the open market, we have found that a reasonable value for her services rendered to petitioner during the taxable years to be $200 a month. The next issue is the correct amount of dividends received by petitioner on his American Power & Light Company stock for the years 1939 and 1940. Mrs. Vines testified unequivocally that petitioner owned 100 shares of stock during those taxable years on which he received dividends and that the dividends received therefrom during the taxable year 1939 amounted to $431.25 and that the dividends received by petitioner during the taxable year 1940 amounted to $593.75. Respondent agrees that there is evidence to support petitioner's contention in this respect and on this issue petitioner is sustained. The next issue involves the *235 deductibility of interest payments made by petitioner during the years 1937 and 1938. On his income tax return for 1937 and 1938 petitioner claimed a deduction for interest paid amounting to $1,575.52 on notes signed by him and his wife. Respondent disallowed one-half of this amount apparently on the theory that Mrs. Evans was entitled to one-half the deduction because she filed a separate income tax return for that year. Mrs. Evans' return for 1937 was introduced in evidence. It shows that she did not make any claim for a deduction for any part of this interest. Respondent admits that the interest was paid and we think petitioner is entitled to this deduction. Certainly it meets the requirements of the statute as interest paid on an indebtedness on which petitioner was liable. The authorities support this view. See George A. Neracher, 32 B.T.A. 236 and Elma M. Williams, 3 T.C. 200, 202. For the year 1938 it is a different story. Petitioner claimed a deduction for interest paid, amounting to $1,610, during that year. On Mrs. Evans' income tax return for 1938 she claimed a deduction for interest amounting to $9,876.39. Petitioner now seeks to increase his *236 deduction claiming that he took only one-half of interest paid on notes signed by him and his wife. The difficulty is, however, that it is impossible to tell from the record how much of the interest paid by petitioner was on a joint liability of him and his wife or how much interest on that joint liability was paid by Mrs. Evans. For all it appears the interest paid by Mrs. Evans and claimed by her on her return was on her separate indebtedness, to which petitioner was not a party. If we assume for the sake of argument that petitioner made the additional payments involved it still does not appear that he was liable therefor, in which event the deduction must be denied. Eskimo Pie Corp., 4 T.C. 669. For lack of evidence respondent is sustained. The next issue involves the deductibility of interest payments claimed by petitioner to have been made to the American Savings Life Insurance Company. Petitioner claims deductions for interest paid during the years 1937 to 1940, inclusive. As to 1937 and 1938, there is no evidence to support the deductions claimed. The record does indicate that petitioner was indebted to the Insurance Company on a policy loan in the sum of $6,025. *237 It further appears that in November 1938 he executed an extension agreement covering the premium on that policy and the interest on his loan whereby these sums were to be liquidated by monthly payments. The total amount due was $1,177.26. Petitioner paid $277.26 of this amount in November 1938 and paid the balance during 1939. There were some additional interest items on these deferred payments amounting to $23.03 paid in 1939. The premium and interest for the succeeding year were handled in the same manner. The record shows that petitioner paid $177.26 in 1939 and $823 in 1940 on this latter extension agreement. Respondent argues that there is no evidence on which we would be justified in finding that petitioner made interest payments in the amounts claimed for the years 1939 and 1940. For the year 1939, if we regard the original payment in November 1938 as part payment of the premium, then it would follow that the balance of the payments made during 1939 represented payment in full of the premium and interest on the loan. Similar treatment for 1940 would indicate an interest payment totaling $184.50 because it does not appear that petitioner paid in 1940 the full amount called for *238 by the extension agreement. We think the installment payments must be applied first to premium and thereafter to interest, since the payment of the premium to keep the insurance policy in force was of primary importance. The final issue, whether or not petitioner is entitled to an operating loss carry-back, is by agreement not to be determined at this time. Because of the number of complex issues involved, we think it is best that decision be entered under Rule 50. At a hearing on the Rule 50 computation it can be determined whether or not petitioner is entitled to prevail in this issue. Decisions will be entered under Rule 50.